Susan E. Sangiolo & others[1] vs. Board of Aldermen of Newton & others.[2] No. 00-P-1938. February 7, 2003. *Zoning*, Special permit, Variance, Telecommunications facility, Height restriction, Nonconforming use or structure. *Municipal Corporations*, By-laws and ordinances.

ATS-Needham, LLC/American Tower Systems, Inc. (ATS), a defendant, owns a 1,200-foot tower sitting on land in Newton Upper Falls on the western edge of the city of Newton. The tower, one member of a four-tower "farm" straddling Route 128 in the Newton/Needham area, has been in place since 1952 and supports antennas used for radio, television, and other wireless communication. Because of a Federal Communications Commission mandate requiring every television station in the United States to begin building digital high-definition television (HDTV) facilities, ATS seeks to replace its tower with one of the same approximate height but capable of supporting HDTV antennas' greater weight. ATS obtained, from the defendant board of aldermen of Newton (board), a special permit to do so, and the plaintiffs, whose property is close to the ATS tower, appealed to the Superior Court. See G. L. c. 40A, § 17. After a three-day trial, a judge entered careful and comprehensive findings of fact and conclusions of law leading to a judgment that the board had acted within its authority. From that judgment, the plaintiffs appealed to this court. The appeal challenges none of the judge's factual findings but does assert that certain of her legal rulings were erroneous. We affirm.

1. As the trial judge correctly concluded, the board's 1954 order allowing the initial construction of the tower was a special permit, not a variance.[3] True, the order contained the word "variance" not once, but three times. But the order used the word to indicate action sought through a special permit, not as a noun labeling a particular form of zoning relief. The order's operative

---

[1]Five additional residents of the Newton Upper Falls community in Newton are also plaintiffs.

[2]Twenty-four members of the board of aldermen of Newton are individually named as defendants. ATS-Needham, LLC/American Tower Sytems, Inc., is also a defendant.

[3]Whether the order was a special permit or a variance is important because a special permit cannot expand a nonconforming use that originated with a variance. See *Mendes* v. *Board of Appeals of Barnstable*, 28 Mass. App. Ct. 527, 531-532 (1990).

sentence provided that the "petition for variance of application of the Zoning Ordinance, under the provisions of Section 23.4(d)(12) and Section 23.11, be and is hereby granted." At first blush, that language looks like the language of a variance. Review of the cited provisions of the ordinance in context is required to understand why it is not. Section 23.4(a) of the Revised Ordinances of Newton (1952) contained use regulations and restrictions applicable to the residence D district for which the tower was proposed. Section 23.4(d) of the ordinances allowed the board to "give permission, in accordance with the procedure in section 23.20" for fourteen uses not permitted as of right in a residence D district. One of the fourteen, a "radio transmission station," was specified in § 23.4(d)(12). A "radio transmission station" was therefore a permissive use available to one who followed the procedure set out in § 23.20. Likewise, § 23.11 limited the height of structures in a residence D district to forty feet unless the board gave "permission" for a higher structure again "in accordance with the procedure provided in section 23.20."

Turning from substance to procedure, § 23.20(a) provided that, if "in [the board's] judgment[,] the public convenience and welfare [would] be substantially served [thereby], the board . . . on petition, and subject to such appropriate conditions and safeguards as it may impose . . . [could] . . . vary the application of the district regulations . . . to" accomplish eight objectives, each of which was listed in a succeeding subsection. The first seven of those subsections simply referred back to other portions of the ordinance describing permissive uses. For example, the fourth of the seven, § 23.20(a)(4), allowed the board to "[p]ermit certain uses of . . . land in . . . residence D . . . districts (Section 23.4 paragraphs (c) and (d))," a clear and explicit reference back to, inter alia, the permissive use provisions of § 23.4(d)(12) allowing radio transmission stations. Likewise, the last of the seven, § 23.20(a)(7), allowed the board to "[p]ermit certain other special exceptions as specified in . . . section 23.11," a clear and explicit reference back to the permissive exceptions to the residence D height restrictions. Section 23.20(a)(8), the eighth of the subsections, was different because it did not refer back to any other section of the ordinances. Instead, it allowed the board to "[p]ermit with respect to a particular parcel of land a variance from the terms of this chapter" if the applicant made a showing similar to the showing now required by G. L. c. 40A, § 10.

Accordingly, the text of § 23.20, considered in the context of its own internal structure and the structure of the remaining ordinances, shows that the board was empowered to "vary" the provisions of the ordinance either by granting a special permit for permissive uses specifically identified elsewhere in the ordinance, like the very tall radio transmission stations at issue here, or, where no permissive use was specified elsewhere, by granting a variance if the applicant could meet the now familiar requirements for a variance. Considered in that context, there can be no doubt that the board's order granted a special permit notwithstanding its use of the word "variance."

2. There is no merit to the plaintiffs' contention that the provisions of § 23.4(d)(12) authorizing special permits for "radio transmission station[s]" excluded permits for television stations. Construed sensibly, see *Commonwealth v. Williams*, 427 Mass. 59, 62 (1998), the word "radio" has always referred to "the transmission and reception of electric impulses or signals by

means of electromagnetic waves without a connecting wire. . . ." Webster's Third New International Dictionary 1872 (1993), and "includes wireless, television, and radar." *Ibid.*

3. The 1973 modification to the 1954 permit, which simply dropped a restriction the earlier permit contained, was itself a special permit. That document, too, contains some language consistent with granting a variance. But the document did not recite all of the factors necessary for a variance and, most significantly, omitted any reference to "hardship," the wellspring of all variances. Moreover, the modifying order stated twice, and both times in capital letters, that the board was allowing a "PERMISSIVE USE" of the premises.

4. When the ordinance was changed in 1998 to prohibit special permits altering the forty-foot height limitation generally existing in the district where the tower stands, the tower became a nonconforming structure. Cf. *Mendes* v. *Board of Appeals of Barnstable*, 28 Mass. App. Ct. 527, 528-529 (1990) ("[A] nonconforming use is one which is lawfully carried on at the time a provision of a zoning code or an amendment to the zoning code is adopted which prohibits that use.") The nonconforming nature of the tower triggered application of § 30-21(b) of the amended ordinances, which provides that a nonconforming structure may be, among other things, "structurally or substantially altered or reconstructed or may be altered or enlarged to permit the extension of a nonconforming use" if the board finds that the proposed alteration or reconstruction is not "substantially more detrimental than the existing nonconforming use to the neighborhood." ATS obtained from the board a special permit authorizing reconstruction, and the plaintiffs do not challenge the judge's factual determination that the reconstructed tower, although stronger, will not be more detrimental to the neighborhood than is the current one.[4]

5. There is no merit to the plaintiff's invocation of the Rivers Act, St. 1996, c. 258, §§ 17-20, or the Federal Telecommunications Act of 1996, 47 U.S.C. § 332 (2000). The Rivers Act amended G. L. c. 131, § 40, to impose additional conservation restrictions on so-called "riverfront areas," a defined term that includes the area where the ATS tower sits. The statutory phrase upon which the plaintiffs seize prohibits issuance of an "order . . . permit[ting] any work" unless certain conditions are met. But the "order" upon which the relevant phrase focuses manifestly is an "order of conditions," or a component thereof, with which § 40 is solely concerned. Construed in context, see, e.g., *Turner* v. *Lewis*, 434 Mass. 331, 334 (2001), the "order" is not a special permit issued under an

---

[4]The plaintiffs focus their entire energy on an assertion that the 1998 special permit was invalid because the earlier board action had been taken through variances. They, therefore, do not contend that the extremely broad and generous language of § 30.20(b) of the Zoning Ordinances of Newton (1998) did not empower the board to permit erection of the new tower or that G. L. c. 40A, § 6, first par., somehow made § 30.20(b) inapplicable. Neither contention, if made, would have been likely to prevail. The very language of the ordinance illuminates the weakness in the first contention, and cases such as *Lee* v. *Board of Appeals of Harwich*, 11 Mass. App. Ct. 148, 154-155 (1981), suggest the weakness in the second.

entirely different section of an entirely different statute.[5] As for the Federal Telecommunications Act,[6] the permit reflects an appropriate exercise of local government's statutory power over "decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A) (2000). To the extent of a conflict between the permit's limitations on radio frequency emissions and the limits allowed by Federal law,[7] the Federal requirements trump those in the permit. See generally, e.g., *Freeman* v. *Burlington Broadcasters, Inc.*, 204 F.3d 311, 320 (2d Cir. 2000). Nothing the plaintiffs have cited suggests that any such conflict would somehow undo the permit itself.

6. That leaves the plaintiffs' claims of bribery and conflict of interest, claims that are based on the remediation payments promised by ATS and incorporated in the permit. Those claims simply seed the record with poisonous and infertile epithets, for the plaintiffs proffer no authority faintly supporting the notion that payment of money to a charitable trust charged with remediating the permitted construction's adverse impact on the community is a "bribe" or conflict of interest outlawed by G. L. c. 268A or some other statutory provision.

7. The defendant ATS's request for double costs and attorney's fees, pursuant to Mass.R.A.P. 25, as amended, 378 Mass. 925 (1979), and G. L. c. 231, § 6F, is denied.

*Judgment affirmed.*

*Edward J. Collins* for the plaintiffs.

*Laura Steinberg* for ATS-Needham, LLC/American Tower Systems, Inc.

---

[5]In fact, ATS obtained an order of conditions from the Newton Conservation Commission and the board made compliance with that order a condition of the special permit. Nothing in the record suggests that anyone appealed from that order to the Department of Environmental Protection. See generally G. L. c. 131, § 40.

[6]In order to address the merits of the plaintiffs' claim, we suppress significant doubt that the trial judge's unchallenged findings of fact left the plaintiffs with standing to press the point. See 47 U.S.C. § 332(c)(7) (2000).

[7]On this record, no such conflict appears.